**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Civil Action No. 10-cv-00290-WJM-MJW

ALLSTATE SWEEPING, LLC,

      Plaintiff,

v.

CITY AND COUNTY OF DENVER,
DENVER DEPARTMENT OF AVIATION,
APRIL HENDERSON,
CALVIN BLACK,
STEVE DRAPER, and
RUTH RODRIGUEZ,

      Defendants.

---

## ORDER ON MOTION TO DETERMINE ADMISSIBILITY

---

THIS MATTER comes before the Court on Defendants' Joint Motion to Determine Admissibility of Plaintiff's Proffered Expert Testimony ("Motion") pursuant to Rule 702 of the Federal Rules of Evidence. (ECF No. 148.) The Motion is fully briefed, and the Court held an evidentiary hearing on the Motion on May 17, 2011. For the reasons below, the Motion is GRANTED in part and DENIED in part.

## I.    BACKGROUND

Plaintiff Allstate Sweeping, LLC ("Allstate") had a contract with the City and County of Denver ("City") to perform pressure washing services at Denver International Airport ("DIA") through a purchase order and subsequent contract. The contract was signed on June 6, 2006, and covered a 27-month term beginning May 1, 2006. (Contract at 4, § 3.01, ECF No. 148-1.) The contract was worth up to $1.2 million,

though the City had only authorized partial funding in the amount of $350,000 at the signing of the contract. (*Id.* at § 4.03.) The contract could be extended for two one-year periods with written consent of the City. (*Id.* at § 3.01.) However, the maximum contract amount was to remain at $1.2 million with the inclusion of the two one-year extensions unless otherwise authorized. (*Id.*)

Following disputes between Allstate and supervisors at DIA, the City terminated Allstate's contract effective July 1, 2007. (Amend. Compl. at ¶ 34, ECF No. 124.) Plaintiff alleges that during the term of the contract, Defendants discriminated against Allstate by manipulating the work schedule and thereby causing Allstate to lose thousands of dollars each month. (ECF No. 149 at 2.) Plaintiff argues that the fact that it is a white female owned and operated company led it to be treated differently. (ECF No. 149 at 1.) Plaintiff further alleges Defendants have since made false representations about Plaintiff to potential clients of Plaintiff, damaging its reputation. (ECF No. 124 at 11 ¶ 35.)

Plaintiff filed this civil rights case seeking damages for lost past and future income and profits and damage to its reputation. (*Id.* at 21 ¶ B.) Plaintiff endorsed Don Frankenfeld, a forensic economist, to testify regarding Plaintiff's damages. Defendants seek an order excluding the testimony of Frankenfeld based on an assessment that Frankenfeld's assumptions are unreliable. (ECF No. 148 at ¶ 11.)

## II.     STANDARD FOR EXPERT TESTIMONY

### *Admissibility Under Rule 702*

The admission of expert testimony is governed by Rule 702 of the Federal Rules

of Evidence.  Rule 702 states, in pertinent part:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  As the rule makes clear, while required, it is not sufficient that an expert be qualified based upon knowledge, skill, experience, training, or education to give opinions in a particular subject area.  Rather, the Court must "perform[ ] a two-step analysis."  *103 Investors I, L.P. v. Square D Co.*, 470 F.3d 985, 990 (10th Cir. 2006). After "determin[ing] whether the expert is qualified by 'knowledge, skill, experience, training, or education' to render an opinion," *id.* (quoting Fed. R. Evid. 702), the specific proffered opinions must be assessed for reliability.  *See id.*; *see also* Fed. R. Evid. 702 (requiring that the testimony be "based upon sufficient facts or data," be the "product of reliable principles and methods," and reflect a reliable application of "the principles and methods . . . to the facts of the case").

Rule 702 "imposes on the district court a gatekeeper function to 'ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.'" *United States v. Gabaldon*, 389 F.3d 1090, 1098 (10th Cir. 2004) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)).  During the gatekeeping process, the court undertakes two analytical steps.  First, it determines whether a witness is qualified to provide the expert testimony at issue.  Specifically, under Rule 702, an expert must possess expertise based on "knowledge, skill, experience, training or

education." *See United States v. Crabbe*, 556 F. Supp. 2d 1217, 1221 (D. Colo. 2008).

Second, the court must focus on the proffered expert testimony itself to determine if it is reliable.  *Id.*  The testimony must be based on "scientific, technical, or other specialized knowledge," and must be of a kind that will assist the trier of fact in understanding the evidence.  Fed. R. Evid. 702.  The Court must "assess the reasoning and methodology underlying the expert's opinion, and determine whether it is both scientifically valid and applicable to a particular set of facts."  *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221 (10th Cir. 2003) (citing *Daubert*, 509 U.S. at 592-93).  When assessing reliability, "the court may consider several nondispositive factors: (1) whether the proffered theory can [be] and has been tested; (2) whether the theory has been subject to peer review; (3) the known or potential rate of error; and (4) the general acceptance of a methodology in the relevant scientific community."  *103 Investors I*, 470 F.3d at 990 (citing *Daubert*, 509 U.S. at 593-94).  These considerations are not exhaustive.  Rather, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).  Ultimately, the test requires that the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of any expert in the relevant field."  Id.

### Burden of Establishing Admissibility

While the proponent of the challenged testimony has the burden of establishing admissibility, its proffer is tested against the standard of reliability, not correctness; a proponent need only prove that "the witness has sufficient expertise to choose and

apply a methodology, that the methodology applied was reliable, that sufficient facts and data as required by the methodology were used and that the methodology was otherwise reliably applied." *Crabbe*, 556 F. Supp. 2d at 1221 (citing *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 781 (10th Cir. 1999)).

The proponent of the opinion need not prove that the expert is indisputably correct. *See Mitchell,* 165 F.3d at 781. However, the proponent must show that the method employed by the expert in reaching the conclusion is sound and that the opinion is based on facts which sufficiently satisfy Rule 702's reliability requirements. *See id.* A court's focus generally should not be upon the precise conclusions reached by the expert, but upon the expert's qualifications, information relied upon and the methodology employed in reaching those conclusions. *See Daubert,* 509 U.S. at 595; *see also Dodge*, 328 F.3d at 1222.

## III.   ANALYSIS

Defendants move to exclude Frankenfeld's proffered expert opinion testimony regarding damages. (ECF No. 148.) The parties jointly summarize Frankenfeld's expert opinion as:

> To a reasonable degree of forensic economic certainty, the initial contract which inaugurated the business relationship between Plaintiff and the City was for up to $1.2 million or $44,444 per month on average. The revenue generated by the initial contract would have equaled the full amount specified in the contract. On or about August 2008, the revenue generated by the business relationship would be an average of $178,390 per month – after adjusting the comparator contract to $4.0 million reflecting an expansion of job tasks mirroring the expansion of job tasks created by the City on behalf of the successor contractor (AAA National Maintenance) [("AAA")]. Revenue thereafter would grow at an estimated rate of 6% per year, based upon a return on equity of 20% and an earnings retention rate of 30%. In reducing losses to present value, the appropriate discount rate is

15%.  The duration of the business relationship between Plaintiff and the City is estimated at 60 months.  The terminal or residual value of the business relationship after 60 months is $808,270.  The variable cost of generating incremental revenue is 42.48%.  The aggregate damages, reduced to present value, total $4,634,549, after adjusting for a contract size of $4.0 million.  The assumptions made are: 1) the contract would increase in size to $178,390 a month; 2) revenue growth at 6% per year; 3) variable expenses are 42.48%; and 4) a discount factor of 15%.  If all of these assumptions are correct, then by month 60, the cumulative value is $3.8 million with an additional terminal or residual value of $808,270.[1]

(Parties' Joint 702 Mtn. at 1-2, ECF No. 102.)

### A.      Qualified to Render an Opinion

The Court must first determine whether Frankenfeld is "qualified by knowledge, skill, experience, training, or education to render an opinion." *Milne v. USA Cycling Inc.*, 575 F.3d 1120, 1133 (10th Cir. 2009).  Frankenfeld is a forensic economist with degrees from Yale and Harvard, including an MBA from the Harvard Business School.  (ECF No. 149-2 at 2.)  He has provided expert testimony in cases for more than a decade, *id.* at 3-5, including developing a damage calculation model for and testifying on behalf of victims before the September 11th Victim Compensation Fund, ECF No. 149-3 at 1.  Defendants do not contest whether Frankenfeld is qualified to render an expert opinion.  Therefore, the Court finds that Frankenfeld is qualified to render an expert opinion as to Plaintiff's damages resulting from its terminated pressure washing contract with the City.

---

[1] In Frankenfeld's expert report, the total calculated damages is $4,810,532 based on representations from Plaintiff regarding AAA's contract.  However, upon review of AAA's contract, the overall damages figure was reduced to $4,634,549.  (*See* Frankenfeld Dep. at 133 13-134:12.)

B.      **Reliability of Opinion**

The Court must next determine whether Frankenfeld's opinions are reliable.

*Milne*, 575 F.3d at 1133.  The reliability determination focuses on the process or means

by which the witness derived the opinion.  Under Rule 702, an expert may provide

testimony "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is

the product of reliable principles and methods, and (3) the witness has applied the

principles and methods reliably to the facts of the case."  Fed. R. Evid. 702.  The Court

must further determine whether the proffered expert testimony is relevant in that it will

assist the trier of fact.  In so doing, the Court considers non-exclusive factors such as:

(1) whether the testimony is relevant; (2) whether it is within the juror's common

knowledge and experience; and (3) whether it will usurp the juror's role of evaluating a

witness's credibility.  *U.S. v. Rodriguez–Felix*, 450 F.3d 1117, 1123 (10th Cir.2006)

(citations omitted).  The question of relevance is essentially "whether [the] reasoning or

methodology properly can be applied to the facts in issue."  *Daubert*, 509 U.S. at 593;

*see also General Elec. Co. v. Joiner*, 522 U.S. 136, 151–52 (1997).  The consideration

of relevant evidence is one of "fit" or "the logical relationship between the evidence

proffered and the material issue that evidence is supposed to support to determine if it

advances the purpose of aiding the trier of fact."  *Bitler v. A.O. Smith Corp.*, 391 F.3d

1114, 1121 (10th Cir. 2004).  Defendants argue the expert opinion at issue here is not

based upon reliable data, not based on a proper methodology, not based on reliable

assumptions, and not relevant.  (ECF No. 148 at ¶ 8.)

***Underlying Data***

Defendants argue Frankenfeld's opinion is flawed because of the information that he did not use to form his expert opinion.  Frankenfeld did not look at (1) tax returns; (2) audited financial statements; or (3) profits from the sale of equipment.  (ECF No. 148 at ¶ 13, 14, citing Frankenfeld Dep. at 16:13-19, 50:1-17, 105:24-106:2, ECF No. 148-4.) Defendants further argue Frankenfeld could not base his expert opinion specifically on the City contract because Allstate did not keep its books in a manner separating income and expenses by contract.  (ECF No. 148 at ¶ 14.)

The Court disagrees.  During testimony and in his deposition, Frankenfeld described the type of documents he received from Allstate to formulate his opinion. Frankenfeld requested, and received, Allstate's contract with the City, financial statements including income statements, balance sheets, and ledger books showing expenses.  (Unofficial Hearing Tr. ("U. Tr.") 9:39:50-9:40:32.)  Frankenfeld explained that in his experience, he finds such financial statements "to be better information, more detailed information than I would find on a tax return."  (Frankenfeld Dep. at 16:21-23, ECF No. 148-4.)  Frankenfeld explained how he used the ledger books to calculate fixed and variable expenses, and how these calculations allowed him to determine figures specific to the City contract.  (*Id.* at 86:22-91:16; U. Tr. 9:45:38-9:46:06.)

The Court finds that Frankenfeld has shown that he relied upon sufficiently reliable data in formulating his expert opinion.  Where Defendants see weaknesses in Frankenfeld's data, they may show this through cross-examination.  As the Supreme Court stated, "[v]igorous cross-examination, presentation of contrary evidence and

careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 595.

### Methodology

In their Motion, Defendants argue Frankenfeld's methodology is unidentified, vague, and based on unreliable assumptions.  (ECF No. 148 at ¶ 25.)  During testimony, however, Frankenfeld identified his methodology as the discounted cash-flow method, relied upon by "most economists."  (*See* U. Tr. at 10:05:02; 10:06:30.) Frankenfeld explained his reliance on this method because alternative methods, such as the cap rate method, are less dynamic and therefore do not sufficiently take into account revenue and losses while also allowing for projections about the future.  The Court finds Frankenfeld's deposition and testimony explaining the methodology used is reliable and therefore does not preclude admission of Frankenfeld's expert opinion. Defendants' criticisms of the methodology employed by Frankenfeld go to the weight properly to be attributable to his testimony, but are insufficient to preclude as a whole his testimony at trial.

### Assumptions

Within his methodology, Frankenfeld applied a growth rate of 6 percent, a discount rate of 15 percent, and calculated variable expenses at 42.48 percent.  (Expert Report ("R.") at 2, ECF No. 148-3.)  Defendants argue that other economists could use different numbers to formulate their opinion.  (ECF No. 148 at ¶ 25.)  Frankenfeld, however, pointed out that his numbers were, in general, on the conservative end of the scale in determining damages, and specifically conceded that other experts in his field

might have employed different assumptions on these key economic factors.  (U. Tr. at

10:23:34; Frankenfeld Dep. at 111:8-112:15; 147:20-150:6, ECF No. 148-4.)  The Court

need not determine whether Frankenfeld's calculations are correct, but whether they are

reliable.  *See Mitchell,* 165 F.3d at 781 ("The plaintiff need not prove that the expert is

undisputably correct . . . .").  For purposes of its Rule 702 gatekeeper function, the Court

finds these assumptions are reliable.

        Included in Frankenfeld's calculation was a business relationship duration of 60

months.  This exceeds the contract length of 27 months with the inclusion of two pre-

approved one-year extensions, which totals 51 months.  (ECF No. 148-1 at § 3.01.)

Frankenfeld, however, based this calculation on an expected business relationship, and

not on the contract itself.  (Frankenfeld Dep. at 64:14-65:12, ECF No. 148-4.)

Frankenfeld also calculated a growth in income from a monthly average of $44,444 to a

monthly average of $167,000.[2]  (R. at 2, ECF No. 148-3; Frankenfeld Dep. v.2 at

134:22.)  Frankenfeld calculated this growth in income based on the contract awarded

to AAA after Allstate's contract was terminated.

        Defendants argue the initial average monthly income calculation is flawed

because Plaintiffs actual billing only met or exceeded the $44,444 average three times

during the 14 months of Allstate's contract with the City.  (ECF No. 166-6.)  Plaintiff,

however, argue that Defendants manipulated the work to be done so that Plaintiff could

_____

        [2] Frankenfeld initially calculated Allstate's monthly average would increase to $175,000
based on Plaintiff's representations of the value of the AAA National Maintenance contract that
replaced Allstate's contract with the City.  Upon review of the actual contract, however,
Frankenfeld's growth calculations were reduced by approximately 5 percent, including the
overall estimate of damages from

not achieve the full potential of its contract.  (ECF No. 149 at 2.)  Defendants then argue

the growth in income is based on a different contract with a different scope of work and

is therefore unreliable as a calculation of future income for Allstate.  (*See* Frankenfeld

Dep. v.2 at 136:6-15, ECF No. 149-5.)  Frankenfeld explained that in comparing the

Allstate and AAA contracts, there were not many differences other than higher pricing

and a broader area covered.  (Frankenfeld Dep. v.2 at 135:18-136:15, ECF No. 149-5.)

However, both contracts involved the same kind of work and therefore reliance on the

AAA contract provided relevant data.  (See *Id.* at 136:14-15.)

The Court finds that while Defendants revealed significant deficiencies in

Frankenfeld's assumptions and conclusions about the length of the business

relationship, once again these deficiencies ultimately go to the weight to be attributed to

this proposed testimonial evidence, something which of course must be determined by

the jury.

### 3.     Residual Value

Finally, Defendants argue Frankenfeld's calculation of a residual, or terminal,

value of Allstate's contract with the City is not based on reliable information.  (ECF No.

148 at ¶ 23.)  The Court agrees.  Assuming the contract had not been terminated,

Frankenfeld determined Allstate's business relationship with the City could be sold to

another business for approximately $808,000.  (R. at 2, ECF No. 148-3.)  Frankenfeld

acknowledged that Allstate's contract with the City included a non-assignment clause,

restricting the right of assignment without prior written consent from the City.  (U. Tr. at

11:04:38; *see also* ECF No. 148-1 at § 11.05.)  Frankenfeld further acknowledged that

he was not aware of a company that had been interested in such a purchase, but determined that there would have been a residual value to Allstate's business relationship with the City after five years under the contract.  (U. Tr. at 11:00:08-11:00:22; Frankenfeld Dep. at 63:15-66:9.)

Considering the fact that Frankenfeld's analysis of a residual value is calculated for 9 months after Allstate's contract with the City expires, and that it ignores the non-assignment clause in the parties' contract, the Court finds there is simply too great a gap between the data Frankenfeld relies upon and the conclusion he arrives at with regard to residual value for it to be admissible under Rule 702.  *See Bitler*, 391 F.3d 1121 ("[W]hen the conclusion simply does not follow from the data, a district court is free to determine that an impermissible analytical gap exists between premises and conclusion.")  Plaintiff will therefore not be permitted to proffer Frankenfeld's opinion regarding an alleged residual value of Allstate's contract with the City.

## IV.    CONCLUSION

Based upon the foregoing and the entire record before the Court, Defendants' Joint Motion to Determine Admissibility of Plaintiff's Proffered Expert Testimony, ECF No. 148 is GRANTED in part and DENIED in part.

The Court hereby ORDERS:

1)    Frankenfeld may testify as an expert at trial in this case;

2)    Frankenfeld's expert opinion as to Allstate's damages may be presented to a jury; however,

3)    Such testimony shall not include any testimony or documentary evidence

on any alleged residual or terminal value of Plaintiff's contract with the City.

Dated this 2nd day of June, 2011.

BY THE COURT:

William J. Martínez
United States District Judge